UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| IRENE INCUTTO, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil No. 16-12385-LTS |
| NEWTON PUBLIC SCHOOLS and CITY OF NEWTON, | ) ) ) ) | |
| Defendants. | ) ) ) | |

ORDER ON MOTION FOR SUMMARY JUDGMENT (DOC. NO. 36)

April 4, 2019

SOROKIN, J.

Plaintiff Irene Incutto has been an elementary-school teacher for over a decade. She now brings suit against her former employer, Newton Public Schools ("NPS"), and the City of Newton for discrimination under federal and state disability laws. Ms. Incutto alleges that NPS failed to accommodate her documented disability of fibromyalgia by denying her repeated requests to work on a part-time basis and that NPS retaliated against her in a number of ways, including by completing a negative job evaluation and by denying her requests for transfer and grade-level assignments. NPS[1] moved for summary judgment on each of the two pending claims. Doc. No. 36. Ms. Incutto opposed. Doc. No. 48. For the reasons expressed below, NPS's motion for summary judgment is DENIED IN PART AND ALLOWED IN PART.

---

[1] The Court refers to both defendants collectively as "NPS."

I.      Count I: Failure to Accommodate

The Americans with Disabilities Act ("ADA")[2] prevents employers from discriminating "against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). A "qualified individual" is "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." Id. § 12111(8).

> [T]o survive an adverse summary judgment on a failure-to-accommodate claim, a plaintiff must point to sufficient evidence showing that (a) she is disabled within the ADA's definition; that (b) she could perform the job's essential functions either with or without a reasonable accommodation; and that (c) the employer knew of her disability, yet failed to reasonably accommodate it.

Lang v. Wal-Mart Stores E., L.P., 813 F.3d 447, 454 (1st Cir. 2016). For purposes of summary judgment, the parties agree that Ms. Incutto satisfies prong (a), and NPS moves for summary judgment only on prongs (b) and (c). The Court considers this dispute in light of the familiar standard for summary judgment, drawing all reasonable inferences in Ms. Incutto's favor and resolving all disputed issues of material fact in her favor. See LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 841 (1st Cir. 1993) (the Court is "obliged to view the record in the light most favorable to the nonmoving party, and to draw all reasonable inferences in the nonmoving party's favor.").

As the employer, NPS bears the burden of establishing the essential functions of Ms. Incutto's position. See Lang, 813 F.3d at 454 ("the employer bears the burden of showing that a fought-over job function is essential"). "An essential function is one that is 'fundamental' to a

---

[2] The Court notes "that Chapter 151B is considered the Massachusetts analogue to the [ADA]." Jones v. Walgreen Co., 679 F.3d 9, 13 (1st Cir. 2012) (quotation marks and citations omitted). Accordingly, the analysis of Ms. Incutto's federal and state law claims is identical. Id.

position," which requires a "case-by-case determination."  Sepulveda-Vargas v. Caribbean Restaurants, LLC, 888 F.3d 549, 553 (1st Cir. 2018).

> In making this case-by-case determination, the ADA instructs [courts] to give consideration "to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job."

Id. (quoting 42 U.S.C. § 12111(8)).  Other considerations include "the consequences of not requiring the incumbent to perform the function, the work experience of past incumbents in the job, and the current work experience of incumbents in similar jobs."  Id. (quoting 29 C.F.R. § 1630.2(n)(3)).

Admittedly, in attendance cases, the inquiry into "essential function" and "reasonable accommodation" is somewhat muddled, and "courts vary in their treatment of attendance problems in the ADA context."  Ward v. Massachusetts Health Research Inst., Inc., 209 F.3d 29, 33 (1st Cir. 2000).  The Court follows the guidance of the First Circuit and "proceed[s] by considering first whether attendance is an essential function of [Ms. Incutto's] position, and second, if it is not an essential function, is a modified schedule a reasonable accommodation that will allow [Ms. Incutto] to perform the essential functions of [her] job."  Id. at 34.

In August 2013, when Ms. Incutto informed NPS of her medical condition and requested part-time work, she was then a full-time employee.  Doc. No. 45 ¶ 21.  In the spring of 2012, she had interviewed for and accepted a "full-time" position.  Id. ¶¶ 19-22.  Indeed, she was specifically asked about her commitment to a full-time position.  Doc. No. 37-1 at 145 (deposition of Principal Kathleen Smith, who stated, "I recall one of the other elementary school principals stopping the interview to say [to Ms. Incutto], 'I want to remind you this is for a full-time position.  Is that what you're interested in?'").

3

The evidence establishes that in NPS, "[f]ull-time classroom teachers are required to be present in the school building during [school] hours," which are essentially 8:20 am to 3:00 pm, Monday through Friday. Doc. No. 45 ¶¶ 79-80. As common sense suggests, and Ms. Incutto does not dispute, the position of an elementary school classroom teacher is simply not the type of position that one can perform during off-hours or by telecommuting, for example. That said, the record in this case also includes evidence that in previous school years (2006 through 2009), Ms. Incutto worked part-time by job-sharing. Id. ¶¶ 7-8. Additionally, every school year from 2008-09 through 2017-18, between three and seven elementary classroom teaching positions were job-shared between two teachers. Doc. No. 45-1 at 65-67. In fact, in the spring of 2013, when Ms. Incutto inquired about the possibility of a job-share during the 2013-14 school year, her principal was receptive and suggested she speak to another teacher about the possibility of such an arrangement. Id. at 11. Moreover, between 2013 and 2016, when Ms. Incutto was seeking part-time employment by way of a job-share, multiple job-share or part-time positions became available within NPS. Id. at 65-66.

NPS contends that full-time work was an essential function of Ms. Incutto's position as a teacher. That is, because Ms. Incutto had a full-time teaching position, her full-time (8:20 am to 3:30 pm Monday through Friday) presence in the school was required. Because the undisputed evidence establishes that Ms. Incutto could not work full-time due to her disability, NPS seeks summary judgment in its favor. However, the summary judgment record establishes that Ms. Incutto was able to perform all of the essential functions of her kindergarten position, other than full-time presence in the classroom.

While a jury may well accept NPS's position that full-time classroom presence is an essential function of the particular job Ms. Incutto held, this is not a required finding. "Inquiry

4

into whether a particular function is essential initially focuses on whether the employer actually requires employees in the position to perform the functions that the employer asserts are essential." Rooney v. Sprague Energy Corp., 581 F. Supp. 2d 94, 105 (D. Me. 2008) (quoting Benson v. Nw. Airlines, Inc., 62 F.3d 1108, 1113 (8th Cir. 1995)). On the record before the Court, the position of elementary school teacher is not inherently, nor as implemented by NPS, a job that required performance by a single teacher all day, every day, for each classroom of elementary students. Thus, as a matter of fact, the jury could determine that Ms. Incutto's "job" was "elementary school teacher," rather than "full-time teacher," especially in light of the considerations identified by the First Circuit for determining whether a function is essential.

This is particularly so because at summary judgment, NPS has not asserted that continuity with a single teacher in each classroom is essential (i.e. the job always requires full-time presence of the same teacher in each classroom) nor has it asserted that idiosyncratic scheduling considerations preclude an accommodation for partial attendance or job sharing. Cf. Sepulveda-Vargas, 888 F.3d at 554 ("We have previously explained that such 'idiosyncratic characteristics as scheduling flexibility' should be considered when determining the essentiality of a job function.") (quoting Calero-Cerezo v. U.S. Dep't of Justice, 355 F.2d 6, 22 (1st Cir. 2004)). Accordingly, there exists a genuine dispute of material fact as to whether an essential function of Ms. Incutto's job was full-time presence by the same teacher in the classroom.

NPS also argues that even if Ms. Incutto was in fact a qualified individual, her failure to accommodate claim still fails because her request to work part-time was "per se unreasonable within the meaning of the ADA." Doc. No. 37 at 23. In so arguing, NPS relies heavily on Phelps v. Optima Health, Inc., in which the First Circuit held that "[a]n employer is not required by the ADA to create a new job for an employee, nor to re-establish a position that no longer

exists." 251 F.3d 21, 27 (1st Cir. 2001).  In Phelps, the plaintiff was a nurse who was physically unable to lift fifty pounds, which the Circuit held was an essential function of her job.  Id.  In so holding, the Circuit noted that although the plaintiff had previously engaged in job-sharing with other nurses who covered her lifting responsibilities, this fact did not defeat the employer's contention that lifting fifty pounds was an essential function of her job.  Id.  Because the First Circuit held that "an employer need not exempt an employee from performing essential functions, nor need it reallocate essential functions to other employees," id., the employer was not required under the ADA to engage in job-sharing as a reasonable accommodation.

While the holding in Phelps offers support for NPS, after careful consideration, the Court concludes that Phelps does not govern summary judgment in this case.  The plaintiff in Phelps was unable to perform an essential function of the nursing job she held—lifting objects above fifty pounds.  Here, Ms. Incutto (at least for summary judgment purposes) was at all times able to perform all of the functions of the job of kindergarten teacher (she could teach all the relevant subjects and required no exemption from any particular task), though admittedly she could only perform them on a part-time, rather than full-time basis.  Because the Court does not find that full-time classroom presence by the same teacher was necessarily an essential function of Ms. Incutto's job, this case differs materially from Phelps and is not controlled by the disposition there.[3]  Given the job-sharing evidence described above, Ms. Incutto has satisfied her burden to

---

[3] The Court notes that the evidence in Phelps about the employer's previous willingness to provide the plaintiff with accommodations, though not relevant to the essential functions analysis, may be relevant to questions relating to the reasonable accommodation analysis.  See Rooney, 581 F. Supp. 2d at 104 n.4.  However, it also notes that the prior accommodations at issue in Phelps were informal accommodations; one was provided by the plaintiff's sister and co-worker and the other was a restructuring of her job informally allowed by her supervisor but not approved by Human Resources.  251 F.3d at 24-26.  These were, as one court termed it, "special arrangements."  Barlucea Matos v. Corporacion del Fondo del Seguro del Estado, No. CIV. 10-1868-GAG, 2013 WL 1010558, at *7 (D.P.R. Mar. 14, 2013).  In Ms. Incutto's case, the job-

establish that the proposed accommodation—part-time work—is reasonable, at least at summary judgment.[4]

Finally, latent within NPS's argument is the premise that it hired Ms. Incutto for a "full-time" position in 2013 and that shifting her to a part-time position necessarily would have either changed the essential functions of her job or been an unreasonable accommodation. But that is only so if the full-time attribute of her job is essential or if working part-time is per se unreasonable. For the reasons stated, neither is true at the summary judgment stage. NPS did not move for summary judgment on the grounds that allowing Ms. Incutto to work part-time would have been unreasonable given the particular circumstances of her employment or that doing so would have imposed an undue hardship[5] on NPS. Accordingly, such questions are not now before the Court and are properly reserved for trial.

Therefore the motion for summary judgment, Doc. No. 36, is DENIED on Count I.

II.     Count II: Retaliation

"To establish a prima facie claim of retaliation, it is incumbent for a plaintiff to show that he was engaged in protected conduct, that he was subject to an adverse employment action, and that there was a causal connection between the adverse employment action and the conduct."

---

shares were formally approved by NPS. Doc. No. 45 ¶¶ 7-8. Such differences may be relevant at trial, but that question is not now before the Court.

[4] Considerations such as the difficulty of finding someone with whom Ms. Incutto could job-share, possible limits on the number of job-shares for administrative or budgetary reasons, and other considerations may bear, in this case, on the burden the requested accommodation imposes. NPS bears the burden of proof on this point and has not argued it in support of summary judgment.

[5] "[U]nder the ADA, 'the term discriminate includes ... not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability ..., unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business of [the employer].'" Higgins v. New Balance Athletic Shoe, Inc., 194 F.3d 252, 264 (1st Cir. 1999) (quoting 42 U.S.C. § 12112(b)(5)(A)) (alterations in original).

Sepulveda-Vargas, 888 F.3d at 555. To establish that he suffered an adverse employment action, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006).

Ms. Incutto identifies two types of protected activity in which she was engaged: her repeated requests for accommodation and her filing of two complaints with the Massachusetts Commission Against Discrimination ("MCAD") in April 2014 and August 2016. Doc. No. 45-1 at 87. "Requesting an accommodation is protected conduct for purposes of the ADA's retaliation provision," Freadman v. Metro. Prop. & Cas. Ins. Co., 484 F.3d 91, 106 (1st Cir. 2007), as is "the filing of administrative complaints," Valentin-Almeyda v. Municipality of Aguadilla, 447 F.3d 85, 94 (1st Cir. 2006). In this case, NPS concedes that Ms. Incutto has met her burden on the first element of a retaliation claim. Doc. No. 37 at 30.

However, NPS contests both the second and third elements, arguing that Ms. Incutto has neither identified an employment action which was "materially adverse" nor offered any evidence to show that such action was causally connected to her protected conduct. Doc. No. 37 at 30. Ms. Incutto identifies six actions which she argues are "adverse employment actions" for purposes of her retaliation claim: (1) the denial of at least two days per week of leave from October 2013 through May 2016; (2) a negative job evaluation in 2014; (3) the Underwood principal's decision to investigate a parent complaint in September 2014 and the subsequent placement of the parent's complaint in Ms. Incutto's file even though the principal dismissed it; (4) the failure to transfer her out of her position in Underwood Elementary School; (5) the refusal to consider her for the two-part time Intervention Specialist positions which were available for

the 2016-17 school year; and (6) the assignment to a full-time fourth grade position for the 2016-17 school year. Doc. No. 48 at 30-31. The Court considers each in turn to determine whether there is a genuine dispute of material fact as to first, whether "a reasonable employee would have found the challenged action materially adverse," Burlington N., 548 U.S. at 68, and second, whether "there was a causal connection between the adverse employment action and the [protected] conduct." Sepulveda-Vargas, 888 F.3d at 555.

A. Denial of Leave

To the extent that Ms. Incutto alleges that the failure to provide her with at least two days of leave after October 2013 was retaliation for requesting such leave, she is simply repackaging her failure to accommodate claim into a retaliation claim. This she may not do.[6]

B. Negative Job Evaluation

Ms. Incutto filed an MCAD complaint in April 2014. Doc. No. 45-1 at 87. In June 2014, the principal of Underwood "gave Incutto a negative job evaluation . . . in which she criticized Incutto for 'having a different learning experience' in her classroom and for her 'personal illness challenges that have caused Ms. Incutto to miss over 35 days of school." Doc. No. 45 ¶ 62A.

---

[6] See, e.g., Gomez v. Laidlaw Transit, Inc., 455 F. Supp. 2d 81, 90 (D. Conn. 2006) ("To the extent plaintiff claims that defendant's ongoing failure to accommodate her after May 16, 2003 constituted retaliation, this claim is also insufficient as a matter of law. Requesting accommodation inevitably carries the possibility that the employer will not honor the request. If the prospect that an employer might not honor the request would deter a reasonable employee from even making the request, reasonable employees would not request accommodation. For this reason, a failure to accommodate cannot constitute retaliation for an employee's request for accommodation."); Missick v. City of New York, 707 F. Supp. 2d 336, 356–57 (E.D.N.Y. 2010) ("Defendants' alleged failure to accommodate [the plaintiff's] disability subsequent to an ADA . . . protected request cannot be bootstrapped into a viable disability retaliation claim."); Snowden v. Trustees of Columbia Univ., No. 12 CIV. 3095 GBD, 2014 WL 1274514, at *6 (S.D.N.Y. Mar. 26, 2014), aff'd, 612 F. App'x 7 (2d Cir. 2015) ("[A]ny activity comprising Plaintiff's primary failure-to-accommodate claim, such as the submission of a reasonable accommodation request form or participation in the post-request interactive process, cannot also constitute protected activity such as that required to form the basis of a retaliation claim.").

NPS disputes Ms. Incutto's assertion that this evaluation was in fact negative. Indeed, the job evaluation does have some positive comments about Ms. Incutto—such as the fact that she made "significant progress" toward student learning goals and that she "met" her professional practice goals. Doc. No. 45-1 at 71. However, other parts of the evaluation could fairly be read as negative comments about Ms. Incutto's performance, including the statement that "very different learning experiences were observed" among kindergarten classrooms and the recommendation that Ms. Incutto "participate in peer observations and follow up discussions" with other kindergarten teachers. Whether "a reasonable employee would have found the [evaluation] materially adverse," Burlington N., 548 U.S. at 68, is therefore a question of fact properly resolved at trial.

Additionally, both the temporal proximity between Ms. Incutto's April 2014 MCAD filing and the inclusion in the evaluation of the statement about her illness causing her to miss over 35 days of school provides some evidence that "there was a causal connection between the [negative evaluation] and the [protected] conduct." Sepulveda-Vargas, 888 F.3d at 555. Accordingly, a genuine dispute of material fact exists as to whether NPS retaliated against Ms. Incutto by issuing the June 2014 job evaluation.

C. Investigation of the Parent Complaint

In September 2014, though Ms. Incutto was on full-time leave, the principal of Underwood emailed her to set up a meeting to investigate a parent complaint. Doc. No. 45-1 at 87. The principal was aware that Ms. Incutto had experienced difficulties with the parent and student during the previous school year, but "the letter raised new issues that Principal Smith had not previously been aware of concerning Plaintiff's conduct or interaction with the parents." Doc. No. 45 ¶ 57. The meeting was attended by Ms. Incutto, her attorney, and her union

representatives. Doc. No. 45-1 at 87. After the meeting, Ms. Incutto "provided additional documentation to Principal Smith to support her position that she acted appropriately and that parents were difficult and not presenting the facts accurately." Doc. No. 45 ¶ 60. The investigation was closed, and there is no evidence of any disciplinary action taken against Ms. Incutto based on the parent complaint.

Based on the facts in the record, Principal Smith's investigation of the parent complaint cannot properly be considered an adverse employment action. It would not be reasonable for an employee to find such action "materially adverse," especially in light of the fact that no disciplinary action was ever taken. Ms. Incutto was simply invited to attend a meeting to discuss the complaint and then to submit additional documentation regarding the incident. Though Ms. Incutto alleges that the letter was not taken out of her employment file until litigation in this matter, id. ¶ 61, she provides no facts upon which a jury could conclude that the late removal of the complaint was "materially adverse." Without evidence that any potential employers saw the file or that it in some other way may have harmed her, its inclusion in her file until litigation cannot form the basis of an adverse employment action.

   D. Failure to Transfer Out of Underwood

Like the denial of leave, to the extent Ms. Incutto asserts that she requested a reasonable accommodation in the form of a transfer out of Underwood, it is simply another repackaging of the failure-to-accommodate claim. To the extent Ms. Incutto asserts that the failure to transfer her was not a failure to accommodate her disability but was rather a form of retaliation for her prior protected conduct, she has not provided sufficient evidence from which a jury could conclude that the failure to transfer her in this case was "materially adverse." A denial of transfer may in some cases constitute an adverse employment action for a retaliation claim.

However, in this case, Ms. Incutto has not set forth evidence about the rate at which teacher transfers were generally approved, whether there was availability at the other schools and grade levels to which she requested a transfer, or other facts from which a jury could conclude that NPS's denial of her requests to transfer was either materially adverse or causally related to her protected conduct. Therefore, on the record before the Court, no reasonable jury could find that NPS retaliated against Ms. Incutto by refusing to transfer her out of Underwood.

E. Refusal to Consider Ms. Incutto for the Intervention Specialist Positions

Ms. Incutto also asserts that NPS refused to consider her for two part-time Intervention Specialist positions which were available for the 2016-17 school year, though she asked on multiple occasions to be considered for such positions. Doc. No. 45-2 at 3-4. Ms. Incutto asserts that she met the "Required Qualifications" as well as many of the "Desired Qualifications" of the position and that she had experience in a similar position before she was hired at NPS. Id. at 4. Ms. Incutto has set forth sufficient facts to defeat summary judgment on questions of whether NPS in fact refused to consider her for these positions, whether any failure to do so was "materially adverse," and whether the failure was causally connected to her protected activity.

F. Assignment to Fourth-Grade Position

Finally, Ms. Incutto asserts that the fact that NPS assigned her to a fourth-grade position for the 2016-17 school year was an adverse employment action taken in retaliation for her previous protected conduct. Ms. Incutto has submitted evidence that there were two part-time Intervention Specialist positions and one kindergarten position available for the 2016-17 school year. Ms. Incutto argues that assignment to fourth-grade was materially adverse both because she had never taught fourth-grade before and doing so for the first time would require substantial work and effort, and because she specifically requested any Intervention Specialist, kindergarten,

or first-grade positions that were available. On the record before the Court, the assignment to fourth-grade presents triable issues of fact.

IV. <u>CONCLUSION</u>

NPS's motion for summary judgment, Doc. No. 36, is DENIED as to Count I. As to Count II, the motion is ALLOWED IN PART AND DENIED IN PART, as described herein. Trial in this matter shall commence on Monday, July 8, 2019. A scheduling order with additional pretrial deadlines will issue separately.

SO ORDERED.

/s/ Leo T. Sorokin
Leo T. Sorokin
United States District Judge